Matter of Parker J. (Beth F.) (2025 NY Slip Op 06533)

Matter of Parker J. (Beth F.)

2025 NY Slip Op 06533

Decided on November 25, 2025

Court of Appeals

Troutman

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2025

No. 85

[*1]In the Matter of Parker J. et al. Onondaga County Department of Children and Family Services, Respondent; Beth F., Appellant.

Philip Rothschild, for appellant.
Lisa S. Cuomo, for respondent.
Susan B. Marris, attorney for children Parker J. et al.
New York University School of Law Family Defense Clinic et al., amici curiae.

TROUTMAN, J.

This case presents the issue of whether assigned counsel was ineffective when counsel did not speak with a parent before a Family Court hearing to terminate the parent's parental rights. Counsel advised the court that he had not spoken with his client before the hearing began and that he would therefore remain silent. The court informed him that he would have to proceed regardless; counsel did not seek an adjournment in which to speak with the parent until the fact-finding hearing had already begun. We conclude that the parent was deprived of the right to the effective assistance of counsel to which she was entitled.
I.
In 2022, the Onondaga County Department of Child and Family Services (DCFS) commenced this proceeding to terminate the parental rights of respondent, the mother of twins born in 2020. DCFS also named the children's father as a respondent [FN1]. The children were removed from the mother's care when they were approximately six months old.
At the first appearance on December 1, 2022, counsel for DCFS reported that it had been unable to serve the mother with the petition, and substitute service was ordered. The next day, Family Court assigned counsel to the mother. At the next court appearance, the mother's counsel was unable to be present, and the mother did not appear. However, the mother's DCFS caseworker had spoken to the mother and relayed that the mother was amenable to surrendering her parental rights. Because substitute service was accomplished, and the mother did not appear, the court then initially found the mother in default. A hearing was thereafter scheduled for February 15, 2023.
On that date, the mother appeared remotely from the alcohol treatment facility in which she was enrolled, and her counsel appeared in person. At the beginning of the hearing, the court asked the parties, "what are we doing today?" because "there was talk that [the mother] was willing to surrender." Counsel for DCFS described the surrender agreement offer to the mother, and the mother's counsel stated that he had not discussed surrender with the mother. After the court asked the mother directly, the mother stated that she would not surrender her parental rights. The court then took a brief recess for the father's counsel to contact the father, who was absent, during which the court told the mother's counsel that he could call her to discuss "the possibility of a surrender." It is unclear whether the mother spoke with counsel during this recess.
When the hearing reconvened, the mother's counsel informed the court that "this is the first time I've actually even had a chance to speak to my client, so I'm going to remain mute during this hearing." The court informed counsel that he could not remain silent because the mother was present, and therefore counsel had to participate. Once counsel had been told he must participate, counsel asked if anyone "ha[d] those records that were subpoenaed." Counsel did not request an adjournment to speak with the mother or review the subpoenaed records on which DCFS would rely during the hearing. Additionally, the father's counsel asked for an adjournment because the father was not present at the proceeding, and the mother's counsel did not join in that request, which was denied.
The mother's DCFS caseworker then began her direct testimony. After the caseworker had been testifying for some time, the mother's counsel objected that he was unable to speak with the mother during the caseworker's testimony because she was appearing virtually, unlike the father's counsel, who could discuss the case with the father while he was present in court. The court granted counsel a five-minute recess for counsel to speak with the mother on the phone. When the proceeding recommenced, the mother asked to represent herself. After a waiver colloquy, the court granted that request, but instructed the mother's counsel to remain as standby counsel and advised the mother to "let [the court] know" if she changed her mind.
Family Court determined that the mother had permanently neglected the children and proceeded to a dispositional hearing on the same date [FN2]. After the agency's direct examination of the DCFS caseworker, the court informed the mother that they were "at the dispositional phase of this trial, so you can ask [the caseworker] any questions in that regard." The mother responded that she was "not sure what dispositional means" and declined to cross-examine the caseworker. Later in the dispositional hearing, the court informed the mother that she had the opportunity to testify. The mother responded that she did not "understand any of this, so I don't know what I'm supposed to say and not supposed to say." During the following exchange, the mother asked if she could be represented. The court stated: "You may not at this point," and then proceeded to allow the mother's counsel, who was present in the courtroom, to elicit her testimony with direct questions. When mother's standby counsel asked for "a minute" with the mother "without the presence of the other parties," the court denied the request. Counsel made the request again to speak with the mother, raising his concern that the mother stated she did not understand what a dispositional hearing is. The court then granted counsel five minutes to speak with the mother on the phone. After the dispositional hearing, the court determined that it would be in the best interest of the children for the mother's parental rights to be terminated so that the children could be adopted by their foster family, with whom they had been living for some time.
On appeal, the Appellate Division affirmed (232 AD3d 1244 [4th Dept 2024]). The Appellate Division rejected the mother's contentions that she received ineffective assistance of counsel and that she did not knowingly, voluntarily, and intelligently waive her right to counsel (see id. at 1244). This Court thereafter granted the mother leave to appeal (43 NY3d 984 [2025]). We now reverse because the mother was not afforded the effective assistance of counsel.
[*2]II.
A.
"A parent's right to the custody and care of their child is 'perhaps the oldest of the fundamental liberty interests' protected by the Constitution" (Matter of K.Y.Z., — NY3d —, 2025 NY Slip Op 05781, *1 [Oct. 21, 2025], quoting Troxel v Granville, 530 US 57, 65 [2000]). "Fundamental constitutional principles of due process and protected privacy prohibit governmental interference with the liberty of a parent to supervise and rear a child except upon a showing of overriding necessity" (Matter of Marie B., 62 NY2d 352, 358 [1984]). It is therefore "well-settled that parents have a fundamental right to custody of their children" (S.L. v J.R., 27 NY3d 558, 562 [2016]).
This Court has long recognized that the fundamental nature of this right requires an indigent parent to be assigned counsel if the state seeks to terminate that right. "A parent's concern for the liberty of the child, as well as for [the child's] care and control, involves too fundamental an interest and right . . . to be relinquished to the State without the opportunity for a hearing, with assigned counsel if the parent lacks the means to retain a lawyer" (Matter of Ella B., 30 NY2d 352, 356 [1972]). "To deny legal assistance under such circumstances would . . . constitute a violation of [the parent's] due process rights" (id. at 356-357). This constitutional right to assigned counsel in proceedings to terminate parental rights was codified 50 years ago (see Family Court Act §§ 261, 262).
Despite the longstanding nature of the right to assigned counsel in such proceedings, we have never considered whether the right to assigned counsel in family court proceedings necessarily encompasses the right to effective assistance of counsel. The Appellate Division, however, has determined that "because the potential consequences are so drastic, the Family Court Act affords protections equivalent to the constitutional standard of effective assistance of counsel afforded defendants in criminal proceedings" (Matter of Brown v Gandy, 125 AD3d 1389, 1390 [4th Dept 2015] [internal quotation marks omitted]; see e.g. Matter of Adam M.M., 179 AD3d 801, 802 [2d Dept 2020]; Matter of Matthew C., 227 AD2d 679, 682 [3d Dept 1996]; see also Matter of Bryant Angel Malik J., 76 AD3d 936, 937 [1st Dept 2010]).
We agree with the Appellate Division—as do all parties to this appeal—that the right to assigned counsel in proceedings to terminate parental rights necessarily encompasses the right to effective assistance of counsel. The fundamental right of parents to the companionship, care, and custody of their children is too precious a right to sever without the meaningful assistance of counsel (cf. Santosky v Kramer, 455 US 745, 758-759 [1982]). "[W]hether the proceeding be labelled civil or criminal, it is fundamentally unfair, and a denial of due process of law for the state to seek removal of the child from an indigent parent without according that parent the right to the assistance of court-appointed and compensated counsel" (Ella B., 30 NY2d at 357 [internal quotation marks omitted]).
B.
Although an attorney's representation of a parent in Family Court differs in many ways from an attorney's representation of a criminal defendant, we have previously relied upon analogous criminal cases when discussing right-to-counsel issues in the Family Court context (see Matter of Kathleen K., 17 NY3d 380, 384-387 [2011]). In the criminal context, "[t]o prevail on an ineffective assistance claim, [the party bringing the claim] must demonstrate the absence of strategic or other legitimate explanations—i.e., those that would be consistent with the decisions of a reasonably competent attorney—for the alleged deficiencies of counsel" (People v Maffei, 35 NY3d 264, 269 [2020] [internal quotation marks omitted]; see also People v Benevento, 91 NY2d 708, 712 [1998]). Additionally, "a court must examine whether counsel's acts or omissions prejudice[d] the defense or defendant's right to a fair trial" (Benevento, 91 NY2d at 713-714 [internal quotation marks omitted]). "While the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case" (id. at 714). Under our state standard, a litigant need not satisfy the prejudice test of the federal standard, because "[o]ur focus is on the fairness of the proceeding as a whole" (People v Stultz, 2 NY3d 277, 284 [2004]).[FN3]
"Essential to any representation, and to the attorney's consideration of the best course of action on behalf of the client, is the attorney's investigation of the law, the facts, and the issues that are relevant to the case" (People v Oliveras, 21 NY3d 339, 346 [2013]; see People v Droz, 39 NY2d 457, 462 [1976]). In Droz, for example, we held that counsel was ineffective when he "made little or no effort to prepare the case for trial" and "did not consult with [*3]his client until two months after his appointment, and then only on the first day of the initial trial" (Droz, 39 NY2d at 462). The Appellate Division has similarly found counsel to be ineffective in Family Court cases where counsel failed to communicate with their client (see Matter of Mitchell v Childs, 26 AD3d 685, 687 [3d Dept 2006]). And, in a case involving a determination of filiation and child support, we did not decide an issue regarding effective assistance of counsel but observed that, under the circumstances present in that case, counsel's failure to speak to his client before a hearing began was "troubling" and "should not have occurred" (Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 6 [2010]).
Here, despite being assigned more than two months earlier, counsel had not spoken to the mother before the hearing to terminate her parental rights had already begun. We cannot determine based on this record why counsel and the mother did not speak prior to the fact-finding hearing, and the court did not inquire, so the reasons for that lack of communication are pure speculation. Even assuming, however, as DCFS urges us to do, that counsel attempted to contact the mother but was unsuccessful, there is no strategic or other reasonable explanation for counsel's failure to request an adjournment of the proceeding so that he could speak to his client before the fact-finding hearing began, especially when the mother indicated that she would not be surrendering her parental rights. Before the mother indicated that she would not, in fact, surrender her parental rights, counsel could have legitimately thought that the fact-finding hearing would not go forward. However, once it was clear that the hearing was about to commence, counsel should have requested an adjournment to speak to his client about the proceeding and its implications. Counsel's failure to do so lacks a strategic or legitimate explanation.
Counsel also appeared unprepared, questioning whether the records that were subpoenaed were available to be reviewed and announcing that he would remain silent during the hearing, only to be admonished by the court that he was required to participate. In addition, the court, faced with a record that showed counsel's unpreparedness to proceed due to lack of communication, continued forward with the fact-finding hearing and the dispositional hearing even after it was clear that the mother did not understand the proceedings, denied the mother's subsequent request to be represented by counsel even though the court told the mother she could change her mind about self-representation, and gave the mother's standby counsel only five minutes in which to explain the proceedings to her.
We respectfully disagree with the dissent's conclusion that counsel's request for an adjournment would have been "futile" because the court directed counsel to participate and had denied the request of the father's counsel for an adjournment (see dissenting op at 7-8). The fact that the court insisted on counsel's participation in no way relieves him of the obligation to ensure that his client understood the proceedings and to seek an adjournment, if necessary, in which to explain them to her, or to ascertain her objectives before the fact-finding hearing began. Moreover, counsel cannot be relieved of his obligation to protect his client's rights for the record simply because the court insisted on proceeding expeditiously.
In the absence of a statutory mechanism in Family Court proceedings "for determining what may have happened off the record," akin to a CPL article 440 proceeding in the criminal context, the dissent opines that parents who do not have record-based claims of ineffective assistance of counsel are left "in a sort of due process purgatory" (dissenting op at 9-10). Whether the legislature chooses to create such a mechanism in Family Court proceedings (which, as the dissent notes, would impact permanency for the children) is beyond our purview. We simply conclude that parents, like the mother here, who can establish ineffective assistance of counsel on the face of the record are entitled to a remedy.
We are conscious that our determination is based on a cold transcript, and thus we do not have the benefit of context that could bear upon our analysis, and that the mother never complained about the adequacy of her counsel on the record. Nevertheless, counsel's failure to communicate with the mother before the hearing to terminate her parental rights means that counsel necessarily failed to explain the proceedings to the mother, prepare her for testimony, and ascertain her objectives, which undoubtedly impaired her right to a fair proceeding. With so much at stake, counsel could not allow the fact-finding hearing to begin without at least requesting a brief adjournment to discuss the proceeding and its implications with his client. Under the unique circumstances of this case, we conclude that the mother was not afforded the effective assistance of counsel to which she was entitled.
III.
Attorneys who represent family members in Family Court have long been overburdened and under-resourced (see Jeh Johnson, Report from the Special Adviser on Equal Justice in the New York State Courts, 54 [2020] [available at https://www.nycourts.gov/whatsnew/pdf/SpecialAdviserEqualJusticeReport.pdf [last accessed Nov. 19, 2025]; Franklin H. Williams Judicial Commission of the New York State Courts, Report on New York City Family [*4]Courts, 3-6 [2022] [available at 
https://www.nycourts.gov/LegacyPDFS/IP/ethnic-fairness/pdfs/FHW%20-%20Report%20on%20the%20NYC%20Family%20Courts%20-%20Final%20Report.pdf [last accessed Nov. 19, 2025]). Intractable as these structural difficulties may seem, Family Court is not a "second-class court" (Franklin H. Williams Judicial Commission, Report on New York City Family Courts, at 4).
Accordingly, the order of the Appellate Division should be reversed, without costs, and the matter remitted to Family Court for a new hearing.

CANNATARO, J. (dissenting):

I agree with the majority that individuals who are facing termination of their parental rights are entitled to the effective assistance of counsel. However, any attempt to engraft the criminal standard for reviewing ineffective assistance of counsel claims onto Family Court cases without the well-established procedural safeguards that are in place in the criminal context, such as a mechanism for ascertaining what may have happened between attorney and client outside the record, is not a workable solution (see CPL article 440). In the absence of a similar procedure for evaluating ineffectiveness in termination of parental rights proceedings, the majority declares counsel's performance constitutionally deficient on the face of a murky record. Because I believe both that the recognition of a parallel right to the effective assistance of counsel requires a corresponding method for adjudicating these claims and that, in any event, the result reached by the majority here is not supported by the record in this case, I respectfully dissent.
Mother's twin daughters were born in February 2020 and were removed from her care several months later. In November 2020, mother admitted to neglecting the children due to her untreated substance abuse condition. The Onondaga County Department of Children and Family Services (DCFS) commenced this proceeding in October 2022 to terminate mother's parental rights on the ground of permanent neglect.[FN1]
At the initial appearance, DCFS advised the court that it had been unable to serve mother with the petition, but "believe[d] that she may be in treatment." Family Court authorized substitute service and assigned mother new counsel, the attorney who is the subject of this ineffective assistance claim. Mother did not appear at the next court date. However, the agency advised the court that the caseworker had spoken with mother about the possibility of a surrender and that they believed mother was "willing to do that." Family Court found mother to be in default and scheduled the matter for "either a trial or a surrender."
At the commencement of the scheduled fact-finding hearing, mother appeared remotely from an inpatient treatment facility while her assigned counsel appeared in person. The court broached the subject of whether mother would be agreeing to a surrender and mother's counsel replied, "I have not had a chance to discuss that with my client." The court then asked mother if that was something she was willing to entertain, and mother responded in the [*5]negative. The court then took a brief recess, advising mother's counsel that "[i]f you'd like to step out and give your client a call and talk to her about the possibility of a surrender, I will allow you to do that."
Following the recess, Family Court indicated that it would proceed with the fact-finding hearing, stating "I realize I found [mother] in default, but I will allow everyone to participate today, because everyone's here." When the court asked if there was "[a]nything anyone . . . want[ed] to say before [they] started," mother's counsel replied, "this is the first time I've actually even had a chance to speak to my client, so I'm going to remain mute during this hearing." The court admonished counsel, "You can't do that, . . . . You're the assigned attorney, and she's here. . . . [Y]ou can't remain mute. You have to represent her. Whether she hasn't contacted you, or you haven't contacted her, you've been assigned on this case." After confirming that counsel had been assigned the previous month, the court observed "[t]hat's a lifetime in Family Court. It's been a month, and if she didn't contact you, or you didn't contact her, she has the benefit of counsel, and you need to do your job and represent her, and call her as a witness, or not. You can certainly—after the [agency's] case in chief—have a[n] opportunity to speak to her to see whether she wants to . . . testify or not. But you are also well-versed in this type of law, and you can't stay silent, because she's here. So you gotta participate." Mother's counsel then inquired, "[d]o we have those records that were subpoenaed?" In response, counsel for the agency discussed the three exhibits they would be introducing into evidence. Moments later, father's counsel "request[ed] an adjournment, just for the record" and the court denied same [FN2]. Mother's counsel neither requested an adjournment nor joined in father's request.
During the agency's case-in-chief, mother's counsel made relevant objections and noted that the exhibits had not been made available to him until the Friday before the hearing. After counsel asserted that he was at a disadvantage because he could not confer with mother during the proceedings, the court granted him a five-minute recess to allow him to call mother. Immediately following the recess, mother requested to represent herself. The court conducted a thorough inquiry and mother waived her right to counsel. Mother represented herself for the remainder of the proceeding, with assigned counsel as standby counsel.[FN3]
Notably, at a subsequent proceeding, Family Court expressed concern that mother was engaging in a "delay tactic" by checking out of her treatment facility after her court appearances and then checking back in again before her next scheduled trial date. The court ultimately determined that mother permanently neglected the subject children and, following a dispositional hearing terminated mother's parental rights.
The Appellate Division affirmed, finding, as relevant here, that mother received meaningful representation during the time she was represented by counsel (232 AD3d 1244 [4th Dept 2024]).
As noted above, the majority adopts the criminal standard for ineffective assistance of counsel to evaluate the claim in this case. The problem is not the legal standard itself—if an individual is entitled to constitutionally effective representation, the well-settled meaningful representation standard is the bar that must be reached. The problem is the application of that standard to the Family Court, both because the majority's one-size-fits-all approach fails to account for the unique challenges presented in the handling of Family Court cases—particularly the piecemeal fashion in which most hearings are conducted and statutory commands regarding the timing of certain hearings—and because there is no available mechanism for a postjudgment hearing to determine matters that may not appear on the record.
"The constitutional requirement of effective assistance of counsel will be satisfied when 'the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation'" (People v Flores, 84 NY2d 184, 187 [1994], quoting People v Baldi, 54 NY2d 137, 147 [1981] [emphasis omitted]). "[I]t is incumbent on defendant to demonstrate the absence of [*6]strategic or other legitimate explanations for counsel's alleged shortcomings" (People v Benevento, 91 NY2d 708, 712 [1998] [internal quotation marks and citations omitted]). As we have recognized, "[g]enerally, the ineffectiveness of counsel is not demonstrable on the main record but rather requires consideration of factual issues not adequately reflected on that record" (People v Maffei, 35 NY3d 264, 269 [2020] [internal quotation marks and citation omitted]). "[A]lthough there may be some cases in which the trial record is sufficient to permit a defendant to bring an ineffective assistance of counsel claim on direct appeal, in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding brought under CPL 440.10" (id. at 269-270 [internal quotation marks and citations omitted]).
Here, in the absence of this statutory procedure, the majority evaluates mother's claim on the face of the record and concludes that mother was deprived of constitutionally adequate representation. Despite acknowledging that we do not know what transpired in the two brief conferences between mother and counsel prior to mother's request to represent herself, the majority concludes that counsel's "failure to communicate" with mother in a timely fashion "means that counsel necessarily failed to explain the proceedings to the mother, prepare her for testimony, and ascertain her objectives" (majority op at 11) and, alternatively, that even assuming counsel had tried and failed to connect with mother prior to the hearing, counsel was ineffective for failing to request an adjournment. These are conclusions reached without record support.
Although the majority purports to apply the criminal ineffective assistance of counsel standard to this case, it does not actually evaluate the circumstances in their totality, relying instead on the fact that counsel had not spoken with mother before the fact-finding hearing began, that he did not request an adjournment and that he "appeared unprepared." In this regard, the majority freely acknowledges that the reasons for the lack of communication between attorney and client "are pure speculation" (majority op at 9). However, in the process of assuming that counsel made unsuccessful attempts to contact mother prior to the hearing, the majority recognizes that the inability to consult with her prior to the hearing would not, in itself, necessarily be ineffective (see majority op at 9). As a result, the majority must ultimately conclude that the problem is really counsel's failure to request an adjournment and his apparent lack of preparation.
Since we are engaging in speculation, it is not difficult to posit a reasonable explanation for any lack of preparedness on counsel's part, particularly if he was having trouble getting in touch with mother. As noted above, prior to the fact-finding hearing Family Court had found mother in default and the agency represented that they believed mother was willing to consent to a surrender. Thus, counsel may not have requested an adjournment prior to the commencement of the fact-finding hearing because he may not have anticipated that they would be proceeding with a hearing, or at least not a plenary hearing in which mother's participation would be required. Nor is the failure to request an adjournment after it became clear the fact-finding proceeding was going forward, or to join in the adjournment request by father's attorney, impossible to explain on this record. After vacating mother's default, Family Court directed counsel to participate regardless of whether he had had an opportunity to consult with his client and denied father's counsel's request for an adjournment. Counsel could have gleaned that any request for an adjournment on his part would be futile. In addition, to the extent the majority draws the conclusion that counsel was unprepared because, once he was told he had to proceed, he questioned whether the subpoenaed records were available to be reviewed, that is yet another ambiguity in this record [FN4]. Later in the proceeding, when the agency's exhibits were being introduced into evidence, counsel stated, in the course of an objection to the admissibility of the records, that he "would like the Court to realize that these exhibits were not made available to counsel until this past Friday." An eminently reasonable conclusion to be drawn from this statement is that counsel had, in fact, reviewed these records prior to the fact-finding hearing, but for whatever reason, did not have them in front of him in the courtroom.
The majority cites People v Droz (39 NY2d 457 [1976]), as an example of a case where an unprepared attorney who failed to communicate with their client prior to trial was found ineffective (majority op at 8). But, that the effective assistance of counsel requires more than "a person with a law degree" being present in the courtroom, and necessarily incorporates a degree of preparation appropriate to the circumstances of the case, are unremarkable propositions (People v Bennett, 29 NY2d 462, 466 [1972]; see Strickland v Washington, 466 US 668, 690-691 [1984]). We review ineffective assistance of counsel claims under a meaningful representation standard and, as explained, the only thing that is clear from this record is that attorney and client had not had an opportunity to connect prior to the first day of the fact-finding hearing. In this vein, the attorney in Droz was not found ineffective solely due to a lack of preparation, but based on "all the omissions and errors of defense counsel," including bringing highly prejudicial information to the jury's attention and opposing the trial court's declaration of a mistrial based on that prejudicial error, due to counsel's misapprehension of the law (see 39 NY2d at 461-463). Indeed, in the criminal context, the defendant has the burden of "overcom[ing] the strong presumption that defense counsel rendered effective assistance" (People v Ambers, 26 NY3d 313, 317 [2015]). The majority applies a contrary presumption to find mother's counsel ineffective here (compare Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 4, 6 [2010] [characterizing counsel's failure to consult with father, where counsel admitted the "file fell through the cracks," as "troubling"]).
Putting aside any disagreement as to the application of the meaningful representation standard in this case, the absence of a mechanism for determining what may have happened off the record leaves parents in termination proceedings, who are statutorily and constitutionally entitled to the effective assistance of counsel, in a sort of due process purgatory. As in the criminal context, presumably a significant portion of ineffective assistance claims will not be suitable for adjudication on a cold record. Consequently, although the majority deems counsel to have been ineffective under the circumstances presented here, any parent who does not have a record-based claim will be left without a remedy. The legislature should address this inequity in a manner that accommodates both the parents' right to effective assistance of counsel and the priority of permanency for the children.[FN5]
Order reversed, without costs, and matter remitted to Family Court, Onondaga County, for a new hearing. Opinion by Judge Troutman. Chief Judge Wilson and Judges Rivera, Singas and Halligan concur. Judge Cannataro dissents in an opinion, in which Judge Garcia concurs.
Decided November 25, 2025

Footnotes

Footnote 1: The father subsequently surrendered his parental rights, and he is not a party to this appeal.
Footnote 2: At the previous appearance, the court informed the parties that it would reserve decision on the permanent neglect finding until the next appearance, during which the dispositional hearing would also occur.

Footnote 3: Although our dissenting colleagues disagree that we should apply this standard to Family Court proceedings, they offer no alternative standard that, in their view, would be better suited.

Footnote 1: Mother has not visited with the subject children since May 2022.

Footnote 2: As noted in the majority opinion, father ultimately agreed to a surrender of his parental rights. His rights are not at issue on this appeal.
Footnote 3: Between appearances at the ongoing fact-finding hearing, counsel continued to communicate with mother and negotiated with the agency for more favorable terms on a potential surrender. In addition, mother permitted now-standby counsel to conduct a direct examination of her and give a brief closing statement at the dispositional hearing. At the close of the termination proceeding, Family Court thanked counsel "for all you've done in this matter."

Footnote 4: The majority does not disturb the Appellate Division's conclusion that mother made a valid waiver of the right to counsel (see 232 AD3d at 1244). Nonetheless, the majority references both the court's conduct and mother's apparent lack of understanding of the proceedings following that valid waiver in its discussion of counsel's alleged lack of preparation (see majority opinion at 9-10). Needless to say, these circumstances, occurring after counsel was relieved of his representation, have nothing to do with whether counsel rendered ineffective assistance.

Footnote 5: Before the procedures of CPL article 440 were enacted to address claims of ineffective assistance of counsel in the criminal context, there existed the ancient writ of error coram nobis whereby a defendant could seek judicial redress of claims not evident on the face of the record (see e.g. People v Andrews, 23 NY3d 605, 610-611 [2014]). I do not suggest that the majority should take this opportunity to declare a new writ of error coram nobis for Family Court cases in the absence of a legislative solution—quite the contrary—but even that precipitous "solution" would put more safeguards in place than the procedural void that the majority leaves in its wake today.